UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

MICHAEL COMARDELLE                                                           CIVIL ACTION

VERSUS                                                                              No. 13-6555

PENNSYLVANIA GENERAL INSURANCE                                    SECTION I
COMPANY ET AL.

ORDER AND REASONS

Before the Court are motions[1] for summary judgment filed by defendant, P2S, LLC ("P2S"), seeking the dismissal of plaintiffs' claims and the Avondale Interests'[2] crossclaims. Plaintiffs and the Avondale Interests oppose the motions.[3] P2S has also filed an alternative motion for partial summary judgment.[4] For the following reasons, the motions for summary judgment are **GRANTED**, and the alternative motion for partial summary judgment is **DISMISSED AS MOOT**.

BACKGROUND

Plaintiffs allege that decedent, Michael Comardelle ("Comardelle"), was "exposed to asbestos and asbestos-containing products manufactured, distributed, and sold" by defendants during the course of his employment from 1963 through 1979.[5] Plaintiffs allege, "As a result of these exposures to toxic substances, including asbestos, [Comardelle] contracted cancer, mesothelioma, and lung cancer, which was first diagnosed on approximately September 25,

---

[1] R. Doc. Nos. 386, 391, 393.
[2] In the context of this motion, the "Avondale Interests" are defendants, Huntington Ingalls Incorporated, Albert L. Bossier, Jr., and J. Melton Garrett.
[3] R. Doc. Nos. 457, 464.
[4] R. Doc. No. 402.
[5] R. Doc. No. 1-2, ¶¶ 6, 66.

2013."[6] Comardelle died on May 3, 2014, and his widow and children were substituted as plaintiffs.[7]

Among a myriad of other claims, plaintiffs allege that Comardelle was exposed to asbestos during his employment with SECO Industries, Inc. ("SECO")[8] from 1973 through 1979.[9] The original complaint alleged that the successor-in-interest to SECO's liability is PSC Industrial Outsourcing, LP ("PSCIO"),[10] as SECO was merged into PSCIO on January 1, 2001.[11]

The parties agree that PSCIO formed Luling Acquisition, LLC ("Luling") as a wholly owned subsidiary in 2003.[12] PSCIO subsequently transferred assets to Luling pursuant to a "Contribution Agreement."[13] PSCIO then sold Luling to Plant Performance Services, LLC ("PPS"), a wholly owned subsidiary of Fluor Enterprises, Inc. ("FEI"), pursuant to a "Membership Interests and Asset Purchase Agreement."[14] Luling was subsequently renamed P2S, LLC ("P2S"), and it remains a wholly owned subsidiary of PPS.[15]

On April 28, 2014, Comardelle filed a first supplemental and amending petition naming P2S as the successor-in-interest to SECO's liability,[16] and on May 5, 2014, the Court granted the

---

[6] R. Doc. No. 1-2, ¶ 9.
[7] R. Doc. No. 100.
[8] SECO Industries, Inc. changed its name to Philip/SECO Industries, Inc. in 2000. R. Doc. No. 386-2, ¶ 3; R. Doc. No. 457-1, ¶ 3; R. Doc. No. 464-13, ¶ 3. This order and reasons refers to the company as SECO.
[9] *See* R. Doc. No. 1-2, ¶ 6; R. Doc. No. 563.
[10] R. Doc. No. 1-2, ¶ 6.
[11] R. Doc. No. 386-2, ¶ 4; R. Doc. No. 457-1, ¶ 4; R. Doc. No. 464-13, ¶ 4.
[12] R. Doc. No. 386-2, ¶ 5; R. Doc. No. 457-1, ¶ 5; R. Doc. No. 464-13, ¶ 5.
[13] R. Doc. No. 386-6.
[14] R. Doc. No. 386-19; *see also* R. Doc. No. 457, at 3. The Membership Interests and Asset Purchase Agreement also transferred and assigned certain contracts from PSCIO to FEI. *See* R. Doc. No. 386-19, at 2.
[15] R. Doc. No. 386-4, at 6-7.
[16] R. Doc. No. 65, ¶ II.

plaintiffs' motion for voluntary dismissal without prejudice of all claims against PSCIO.[17] The Avondale Interests have asserted crossclaims against P2S for virile share contributions.[18]

The parties agree that "P2S is sued only as the alleged successor to the liability of SECO."[19] P2S asserts that it is entitled to summary judgment because it is not the successor to any potential liability to plaintiffs or the Avondale Interests.[20]

## STANDARD OF LAW

Summary judgment is proper when, after reviewing the pleadings, the discovery and disclosure materials on file, and any affidavits, the court determines that there is no genuine issue of material fact. *See* Fed. R. Civ. P. 56. "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The party seeking summary judgment need not produce evidence negating the existence of material fact, but need only point out the absence of evidence supporting the other party's case. *Id.*; *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195 (5th Cir. 1986).

Once the party seeking summary judgment carries its burden pursuant to Rule 56, the nonmoving party must come forward with specific facts showing that there is a genuine issue of material fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The showing of a genuine issue is not satisfied by creating "'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations

---

[17] R. Doc. No. 70.
[18] R. Doc. No. 112, ¶¶ IX-XIX; R. Doc. No. 120, at 5-6, ¶¶ 1-6.
[19] R. Doc. No. 386-2, ¶ 2; R. Doc. No. 457-1, ¶ 2; R. Doc. No. 464-13, ¶ 2.
[20] R. Doc. No. 386, at 1.

omitted). Instead, a genuine issue of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party responding to the motion for summary judgment may not rest upon the pleadings, but must identify specific facts that establish a genuine issue. *Id.* The nonmoving party's evidence, however, "is to be believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor." *Id.* at 255; *see also Hunt v. Cromartie*, 526 U.S. 541, 552 (1999).

## DISCUSSION

Plaintiffs and the Avondale Interests contend that P2S assumed SECO's potential liability to plaintiffs pursuant to the Contribution Agreement and the Membership Interests and Asset Purchase Agreement,[21] whereas P2S contends that the Contribution Agreement was unambiguous, limited in scope, and did not convey to P2S any potential liability to plaintiffs or the Avondale Interests.[22]

### A. Conflict of Law

This Court has jurisdiction over the above-captioned matter pursuant to 28 U.S.C. § 1442, the federal officer removal statute, which "is a purely derivative form of jurisdiction" that "does not revise or alter the underlying law to be applied [i.e., Louisiana law]." *Arizona v. Manypenny*, 451 U.S. 232, 242 (1981).[23] However, the Contribution Agreement states, "This

---

[21] R. Doc. No. 457, at 9; R. Doc. No. 464, at 10-14.
[22] R. Doc. No. 386, at 1.
[23] *See also Mesa v. California*, 489 U.S. 121, 136 (1989) ("Section 1442(a), in our view, is a pure jurisdictional statute, seeking to do nothing more than grant district court jurisdiction over cases in which a federal officer is a defendant."); *Kolibash v. Comm. on Legal Ethics of the W. Va. Bar*, 872 F.2d 571, 576 (4th Cir. 1989) ("A federal court's role under § 1442 is similar to that of a federal court sitting in diversity."); *City of Aurora v. Erwin*, 706 F.2d 295, 297 (10th Cir. 1983) ("[A] federal court exercising jurisdiction under section 1442(a)(1) serves as an alternative forum in a manner roughly analogous to its role in diversity cases, applying state law through the

Agreement shall be governed by and construed in accordance with the laws of the State of Texas."[24] Likewise, the Membership Interests and Asset Purchase Agreement states, "This Agreement and the other Transaction Documents shall be governed by, and construed and enforced in accordance with, the internal laws of the State of Texas."[25]

Although both plaintiffs and the Avondale Interests assert that the result of this motion is the same under either Texas or Louisiana law because P2S explicitly assumed all liabilities related to SECO,[26] the Avondale Interests also assert that "[t]he choice-of-law provision does not apply to an action that does not arise out of the contract, is not between parties to the contract, and is directed at determining the substantive and equitable issue of successor liability in a tort-based lawsuit."[27]

"'If the laws of the states do not conflict [on the relevant issue], then no choice-of-law analysis is necessary.'" *Schneider Nat'l Transp. v. Ford Motor Co.*, 280 F.3d 532, 536 (5th Cir. 2002) (quoting *W.R. Grace & Co. v. Cont'l Cas. Co.*, 896 F.2d 865, 874 (5th Cir. 1990)). Accordingly, the Court must examine P2S's alleged successor liability pursuant to both Texas and Louisiana law to determine if there is a conflict. Only if there is such a conflict will the Court determine which law it should apply. *See Cain v. Altec Indus., Inc.*, 236 F. App'x 965, 967 (5th Cir. 2007).

---

mechanism of its own procedural rules."); *Winters v. Diamond Shamrock Chem. Co.* (*Winters I*), 941 F. Supp. 617, 620 (E.D. Tex. 1996) ("A federal court's role under § 1442(a) is similar to that of a federal court sitting in diversity. Accordingly, the federal court applies the choice of law rules of the forum state to determine the applicable law.") (internal citation and quotation marks omitted).

[24] R. Doc. No. 386-6, at 4.
[25] R. Doc. No. 386-19, at 39.
[26] R. Doc. No. 457, at 5; R. Doc. No. 464, at 5.
[27] R. Doc. No. 464, at 4.

### B. Successor Liability

In order to determine whether P2S is the successor to SECO's liability, it is appropriate to begin by briefly discussing the effect of the merger of SECO into PSCIO.[28] Pursuant to Delaware law,[29] "[w]hen any merger or consolidation shall have become effective . . . the separate existence of all the constituent corporations, or of all such constituent corporations except the one into which the other or others of such constituent corporations have been merged, as the case may be, shall cease and the constituent corporations shall become a new corporation, or be merged into 1 of such corporations, as the case may be." Del. Code tit. 8, § 259(a); *cf.* La. Rev. Stat. § 12:115(B); Tex. Bus. Org. Code § 10.008(a)(1). With respect to liabilities, Delaware law provides that "all debts, liabilities and duties of the respective constituent corporations shall thenceforth attach to said surviving or resulting corporation, and may be enforced against it to the same extent as if said debts, liabilities and duties had been incurred or contracted by it." *Id.*; *cf.* La. Rev. Stat. § 12:115(E); Tex. Bus. Org. Code § 10.008(a)(3)-(5).

In other words, when the merger became effective, SECO completely ceased to exist—PSCIO, as the surviving corporation, had completely absorbed it, and although PSCIO apparently continued to operate SECO within a separate division and refer to that aspect of its business as "SECO,"[30] PSCIO became the sole corporate entity. Because of the merger, all of SECO's liabilities, including any liability that it incurred to plaintiffs as Comardelle's employer, became PSCIO's liabilities by operation of law. Accordingly, the issue before the Court is

---

[28] *See* R. Doc. No. 386-2, ¶ 4; R. Doc. No. 457-1, ¶ 4; R. Doc. No. 464-13, ¶ 4.

[29] PSCIO, the surviving corporation, is incorporated in Delaware, R. Doc. No. 386-12, at 1, and the certificate of merger was filed with the Delaware Secretary of State, R. Doc. No. 386-12, at 3. The Court also notes that substantially similar provisions exist in both Louisiana and Texas law, and the effect of a merger is the same in Delaware, Louisiana, and Texas. *See* Del. Code tit. 8, § 259; La. Rev. Stat. § 12:115; Tex. Bus. Org. Code § 10.008.

[30] *See* R. Doc. No. 457, at 3 (citing R. Doc. No. 457-11, at 29).

whether PSCIO's potential liability to plaintiffs and the Avondale Interests, derived from its merger with SECO, was transferred to P2S either by agreement or by law.

"[T]he general rule of corporate liability is that, when a corporation sells all of its assets to another, the latter is not responsible for the seller's debts or liabilities,[31] except where (1) the purchaser expressly or impliedly agrees to assume the obligations; (2) the purchaser is merely a continuation of the selling corporation; or (3) the transaction is entered into to escape liability." *Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 182 n.5 (1973). Of course, each state may deviate from this general rule: Texas only recognizes the first[32] and third[33] of these exceptions, whereas Louisiana recognizes all three.[34]

---

[31] The general principle of successor liability is that the doctrine applies to sales of "all" or "substantially all" assets of a company. *See, e.g.*, *Golden State*, 414 U.S. at 182 n.5. A company is free to buy and sell its assets without implicating successor liability unless it disposes of all or substantially all of its assets, thereby leaving later claimants against the company without anything to satisfy their claims. *See Pichon*, 52 So. 3d at 242-45; *see also Bourque*, 476 So. 2d at 1129. Because PSCIO did not sell all or substantially all of its assets to Luling, the Court doubts whether the doctrine of successor liability has any relevance in this case whatsoever.

However, the Court need not and does not decide whether successor liability could ever be implicated under these circumstances. Plaintiffs and the Avondale Interests base their claims on the Contribution Agreement, the Membership Interests and Asset Purchase Agreement, and other extraneous evidence. Even if the doctrine of successor liability is not applicable, the Court would still examine the language of the agreements to determine whether PSCIO transferred to Luling any liabilities related to SECO. Accordingly, because the Court's analysis would be substantially the same regardless of whether successor liability is relevant to this case, the Court need not decide the issue.

[32] Texas narrows the first exception even further, as the Texas Business and Organizations Code "explicitly states that an acquiring company may not be held responsible for a liability of the transferring entity that it does not expressly assume." *Ford, Bacon & Davis, L.L.C. v. Travelers Ins. Co.* (*Ford II*), 635 F.3d 734, 737 (5th Cir. 2011); *see also* Tex. Bus. Orgs. Code § 10.254(a).

[33] There is some support for the proposition that Texas law does not recognize this third exception and would not impose successor liability even in the case of a fraudulent transfer. *See In re 1701 Commerce LLC*, 511 B.R. 812, 823-25 (Bankr. N.D. Tex. 2014); *but see Ford, Bacon & Davis, LLC v. Travelers Ins. Co.* (*Ford I*), No. 08-2911, 2010 WL 1417900, at *6 (S.D. Tex. Apr. 7, 2010), *aff'd*, *Ford II*, 635 F.3d 734.

[34] *Pichon v. Asbestos Defendants*, 52 So. 3d 240, 243-45 (La. App. 4 Cir. 2010); *Bourque v. Lehmann Lathe, Inc., A Division of Smith Int'l, Inc.*, 476 So. 2d 1125, 1127 (La. App. 3 Cir. 1985); *see also Joyner v. Ensco Offshore Oil Co.*, No. 99-3754, 2000 WL 1586404, at *2 (E.D.

The instant motions only implicate the first exception.[35] Plaintiffs and the Avondale Interests argue that Luling expressly assumed all liabilities related to SECO pursuant to the Contribution Agreement.[36] The Avondale Interests also assert in the alternative that if the Court finds that all liabilities related to SECO were not expressly assumed, the Court should find that such liabilities were impliedly assumed.[37]

C. **Texas Law**

Texas has all but abolished successor liability. "Texas law explicitly states that an acquiring company may not be held responsible for a liability of the transferring entity that it does not expressly assume." *Ford II*, 635 F.3d at 737 (citing *Keller Foundations, Inc. v. Wausau Underwriters Ins. Co.*, 626 F.3d 871, 877 (5th Cir. 2010)); *see also In re 1701 Commerce LLC*, 511 B.R. at 823-25.

Pursuant to § 10.254(a) of the Texas Business Organizations Code,[38] "[a] disposition of all or part of the property of a domestic entity,[39] regardless of whether the disposition requires

---

La. Oct. 20, 2000) (Duval, J.); *Allstate Ins. Co. v. Wal-Mart*, No. 98-1923, 2000 WL 388844, at *2-3 (E.D. La. Apr. 13, 2000) (Feldman, J.).

[35] Plaintiffs and the Avondale Interests do not make any argument with respect to the second and third of these exceptions. Furthermore, the Court finds that the record evidence is not sufficient to raise a genuine issue of material fact with respect to either the second or the third exceptions.

[36] R. Doc. No. 457, at 9; R. Doc. No. 464, at 10-14.

[37] R. Doc. No. 464, at 14.

[38] The Texas Business Organizations Code was adopted in 2003. *See* H.B. No. 1156, 2003 Tex. Sess. Law Serv. Ch. 182 (H.B. 1156) (Vernon's). Its predecessor contained substantially similar language. *See* Tex. Bus. Corp. Act, art. 5.10 (expired Jan. 1, 2010); *Ford II*, 635 F.3d at 737. Because there is no substantive difference between the statutes, the Court refers to the currently enacted version of the law for the sake of convenience, and it does not decide which version of the statute would apply.

[39] As stated in the recitals at the beginning of the Contribution Agreement, PSCIO is a Delaware corporation, and Luling was a Delaware LLC. R. Doc. No. 386-6, at 1. The Texas Business Organizations Code defines a "domestic entity" as "an organization formed under or the internal affairs of which are governed by this code." Tex. Bus. Org. Code § 1.002(18). P2S does not address whether either company's internal affairs are governed by Texas law, but neither plaintiffs nor the Avondale Interests argue that Luling was not a "domestic entity" or that

8

the approval of the entity's owners or members, is not a merger or conversion for any purpose." Section 10.254(b) provides, "Except as otherwise expressly provided by another statute, a person acquiring property described by this section may not be held responsible or liable for a liability or obligation of the transferring domestic entity that is not *expressly assumed* by the person." (emphasis added). Neither plaintiffs nor the Avondale Interests have identified any statute that would supplant this general provision. Accordingly, the determinative question under Texas law is whether Luling expressly assumed any liability related to Comardelle's employment with SECO.

The United States Court of Appeals for the Fifth Circuit has outlined contractual interpretation pursuant to Texas law, stating that if a contract "is worded so that it can be given a definite or certain legal meaning, it is not ambiguous and we construe it as a matter of law. Whether a contract is ambiguous is itself a question of law. The fact that the parties offer different contract interpretations does not create an ambiguity. An ambiguity exists only if the contract language is susceptible to two or more reasonable interpretations." *Tex. Indus., Inc. v. Factory Mut. Ins. Co.*, 486 F.3d 844, 846 (5th Cir. 2007) (quoting *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003)) (citations and internal quotation marks omitted).

A contract's terms should be given "'their plain, ordinary, and generally accepted meaning unless the instrument shows that the parties used them in a technical or different sense.'" *Cedyco Corp. v. PetroQuest Energy, LLC*, 497 F.3d 485, 490 (5th Cir. 2007) (quoting *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996)). "When two or more instruments [are] executed contemporaneously or at different times, [and] pertain to the same

---

§ 10.254 should not apply on that basis. Accordingly, and for the sole purpose of this order's conflict-of-law analysis, the Court assumes without deciding that § 10.254 would apply to the transaction between PSCIO and Luling under Texas law. Additionally, the Court notes that none of the parties assert that Delaware law regarding successor liability should apply.

transaction, the instruments . . . will be read together . . . ." *McGoodwin v. McGoodwin*, 181 S.W.3d 870, 874 (Tex. App. 2006).

"'It is the general rule of the law of contracts that where an unambiguous writing has been entered into between the parties, the Courts will give effect to the intention of the parties as expressed or as is apparent in the writing.'" *City of Alton v. City of Mission*, 164 S.W.3d 861, 869 (Tex. App. 2005) (quoting *City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515, 518 (Tex. 1968)). "Only where a contract is first determined to be ambiguous may the courts consider the parties' interpretation and admit extraneous evidence to determine the true meaning of the instrument." *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995); *accord Anglo-Dutch Petrol. Int'l, Inc.*, 352 S.W.3d 445, 451 (Tex. 2011); *see also Discon v. Core Funding Grp., L.P.*, No. 06-2492, 2008 WL 2026094, at *3 (E.D. La. May 9, 2008) (Africk, J.).

Article 1 of the Contribution Agreement is titled "Contribution and Assumption of Liabilities."[40] It states, in pertinent part:

> 1.1 **Contribution of Assets**. PSCIO hereby grants, sells, transfers, conveys, assigns and delivers to the LLC [Luling] all of PSCIO's right, title and interest in and to, and PSCIO's obligations and liabilities under, the real property, personal property, contracts, lease agreements, intellectual property, and other items described on Schedule 1.1 attached hereto (collectively, the "*Assets*"); *provided that*, the Assets shall not include, and PSCIO hereby retains, all right, title and interest in and to all of its accounts receivable.
> . . . .
> 1.2.2 **Assumption of Liabilities**. The LLC [Luling] hereby assumes the Assumed Liabilities. For purposes of this Agreement, "*Assumed Liabilities*" means all liabilities of, and obligations incurred by, PSCIO as of and after the Effective Date in connection with, or arising out of, the Contributed Assets.[41]

---

[40] R. Doc. No. 386-6, at 1.
[41] R. Doc. No. 386-6, at 1-2.

10

Schedule 1.1 consists of more than 700 pages of detailed descriptions of various assets, including: prior business or trade names;[42] real property;[43] fixed assets;[44] tools, tool trailers, and accompanying inventory;[45] other physical inventory;[46] IT hardware inventory;[47] leases to real property, vehicles, and other rental equipment;[48] and other intellectual property.[49] The Contribution Agreement does not explicitly mention tort liability or address liability to former employees or customers.

The dispute presented by the instant motions is entirely dependent on the meaning of article 1.1—specifically, whether the phrase "described on Schedule 1.1" refers to "real property, personal property, contracts, lease agreements, intellectual property, and other items," or whether the phrase "described on Schedule 1.1" refers *only* to "other items." As explained below, the Court finds that the Contribution Agreement is unambiguous, and that Schedule 1.1 is a complete and exclusive list of the assets that were transferred from PSCIO to Luling via the Contribution Agreement.

P2S asserts that Luling only acquired from PSCIO the assets listed in Schedule 1.1, and that pursuant to article 1.2.2 of the Contribution Agreement, Luling only acquired the corresponding liabilities that were connected to or arose out of those assets.[50] P2S asserts: "The historical liabilities of SECO did not exist as separate liabilities at the time of the Contribution Agreement, and Luling did not assume those historical liabilities of SECO with the specific

---

[42] R. Doc. No. 386-16, at 2.
[43] R. Doc. No. 386-16, at 3-5.
[44] R. Doc. No. 386-16, at 6-33.
[45] R. Doc. No. 386-16, at 110-243, 273-659.
[46] R. Doc. No. 386-16, at 244-72.
[47] R. Doc. No. 386-16, at 660-77.
[48] R. Doc. No. 386-16, at 678-98, 700-704.
[49] R. Doc. No. 386-16, at 699.
[50] R. Doc. No. 386-1, at 3.

assets it acquired through the Contribution Agreement; under Texas law, such an assumption of all liabilities of SECO (and especially historical liabilities) must be express if part of an asset transfer."[51] P2S concludes that the Contribution Agreement contains no such express transfer of liability and, therefore, it is not the successor to any liability to plaintiffs or to the Avondale Interests.[52]

Plaintiffs and the Avondale Interests do not dispute that Luling assumed the liabilities "in connection with, or arising out of, the Contributed Assets."[53] However, they both offer a different reading of article 1.1. They contend that Schedule 1.1 is not "a complete list of all assets being transferred to Luling,"[54] but rather that "this provision references real property, personal property, contracts, lease agreements, and intellectual property, as separate and distinct from those items described in Schedule 1.1"[55] Plaintiffs and the Avondale Interests contend that "other items described on Schedule 1.1" is a separate asset category[56] and that the Court should refer to the Membership Interests and Asset Purchase Agreement and other extraneous evidence in order to determine which assets were included in the other asset categories,[57] i.e., "real property, personal property, contracts, lease agreements, [and] intellectual property."[58] Plaintiffs and the Avondale Interests contend that this extraneous evidence demonstrates that PSCIO intended to transfer all of its assets and liabilities related to the entity formerly known as SECO,

---

[51] R. Doc. No. 386-1, at 12 (emphasis omitted).
[52] R. Doc. No. 386-1, at 12.
[53] R. Doc. No. 386-6, at 2; *see* R. Doc. No. 457, at 8-9; R. Doc. No. 464, at 10-11.
[54] R. Doc. No. 464, at 6.
[55] R. Doc. No. 457, at 5.
[56] R. Doc. No. 457, at 6; R. Doc. No. 464, at 6-7.
[57] R. Doc. No. 457, at 6-11; R. Doc. No. 464, at 7-14.
[58] R. Doc. No. 386-6, at 1.

and that a genuine issue of material fact regarding the parties' intent precludes summary judgment.[59]

Plaintiffs' and the Avondale Interests' interpretation entirely rests on the proposition that the only asset category described by Schedule 1.1 is "other items."[60] Under this interpretation,[61] the use of the word "the,"[62] which precedes the list of asset categories in article 1.1, operates to refer the reader to some unspecified extraneous source, outside the four corners of the Contribution Agreement, in order to determine and particularize which real property, personal property, contracts, lease agreements, and intellectual property is being transferred.[63] However, such an interpretation would violate article 3.4 of the Contribution Agreement, which provides that the Contribution Agreement "sets forth the entire agreement of the parties and supersedes all prior agreements, arrangements, and understandings relating to the subject matter hereof."[64]

Conversely, if Schedule 1.1 is understood to define and particularize all of the asset categories listed in article 1.1, the word "the" is not problematic and the conflict with article 3.4 is completely avoided. As P2S notes,[65] Schedule 1.1 identifies and describes real property,

---

[59] R. Doc. No. 457, at 8; R. Doc. No. 464, at 14.
[60] R. Doc. No. 457, at 5; R. Doc. No. 464, at 7.
[61] R. Doc. No. 457, at 5; R. Doc. No. 464, at 7.
[62] The word "the" is "used as a function word to indicate that a following noun or noun equivalent is definite or has been previously specified by context or by circumstance." *the*, Merriam-Webster, http://www.merriam-webster.com/dictionary/the (last visited Dec. 11, 2014); *see also the*, Black's Law Dictionary (6th ed. 1990) ("An article which particularizes the subject spoken of.").
[63] P2S argues that the use of the definite article "the" in article 1.1 "before the illustrative list indicates an intention to reference specific or particular real property, personal property, contracts, lease agreements, intellectual property, and other items," a complete list of which is described on Schedule 1.1. R. Doc. No. 540, at 2 (emphasis and internal quotation marks omitted).
[64] R. Doc. No. 386-6, at 3. Plaintiffs and the Avondale Interests do not address this inherent contradiction.
[65] R. Doc. No. 540, at 1-4.

personal property, contracts, lease agreements, intellectual property, and other items[66]—that is, particular assets from each of the asset categories listed in article 1.1[67]—which further supports the interpretation that Schedule 1.1 is a complete list of all the transferred assets. If plaintiffs' and the Avondale Interests' interpretation that Schedule 1.1 only refers to "other items" was correct, it would be redundant to list anything in Schedule 1.1 that isn't an "other item," thereby rendering the majority of Schedule 1.1's 700 pages useless.[68]

Plaintiffs and the Avondale Interests protest that Schedule 1.1 cannot include *all* of the assets that PSCIO transferred to Luling because then there would be no need to include the other asset categories at all: article 1.1 could simply have defined the "Assets" as "the items described on Schedule 1.1 attached hereto."[69] Of course, PSCIO and Luling *could* have drafted article 1.1 in this manner, but the mere fact that arguably clearer language could have been used does not necessarily inject ambiguity into the contract. The words "real property, personal property, contracts, lease agreements, [and] intellectual property" are not "meaningless or redundant," as plaintiffs and the Avondale Interests contend.[70] Rather, those terms simply describe the types of assets listed in Schedule 1.1.[71]

---

[66] *See supra* notes 42-49 and accompanying text.

[67] R. Doc. No. 386-6, at 1.

[68] P2S argues, "By [plaintiffs' and the Avondale Interests'] reasoning, the enumeration of real property, personal property, contracts, lease agreements, intellectual property, and other items in Schedule 1.1 would themselves be redundant and superfluous if the list in [article] 1.1 was intended to encompass 'all' of each of the categories of items listed." R. Doc. No. 540, at 4.

[69] R. Doc. No. 464, at 7 (emphasis omitted); *see also* R. Doc. No. 457, at 6.

[70] R. Doc. No. 464, at 7; *see also* R. Doc. No. 457, at 6 ("completely superfluous and unnecessary").

[71] Similarly, the Avondale Interests argue that "if Schedule 1.1 is an exclusive list of the assets being transferred, as [P2S] argues, then there was no need to affirmatively exclude the 'accounts receivable', since no accounts receivable are included in Schedule 1.1. [P2S]'s interpretation renders the exclusion unnecessary and meaningless." R. Doc. No. 464, at 7. P2S did not respond to this argument in its reply memorandum.

The rest of plaintiffs' and the Avondale Interests' arguments relate to extraneous evidence, such as the Membership Interests and Asset Purchase Agreement as well as the depositions of various corporate representatives. However, the Court may not consider any extraneous evidence unless it finds that the Contribution Agreement is ambiguous. *See Nat'l Union Fire Ins.*, 907 S.W.2d at 520. Moreover, Luling was not a party to the Membership Interests and Asset Purchase Agreement, and that agreement did not purport to transfer anything to Luling.[72] Instead, it transferred the ownership of Luling from PSCIO to PPS.[73]

In sum, the crucial fact that plaintiffs and the Avondale Interests cannot avoid is that the business formerly known as SECO ceased to exist when it merged with PSCIO. On the merger's effective date, SECO's liabilities became PSCIO's liabilities and were no longer distinguishable or separable. Although plaintiffs and the Avondale Interests envision a continuous chain of liability between SECO and P2S, that chain was broken when PSCIO merged with SECO. Even though PSCIO may have transferred all of its assets that were formerly owned by SECO, the Contribution Agreement did not transfer all of the liabilities that were derived from the merger with SECO, as discussed above. Pursuant to the terms of the Contribution Agreement, only those

---

Regardless, the Avondale Interests' argument with respect to this exclusion does not alleviate the rest of the difficulties presented by their proposed interpretation of the Contribution Agreement, and it does not make their interpretation a reasonable one. Nor does it inject any ambiguity into the contract. *Tex. Indus.*, 486 F.3d at 846. Even if this language is arguably redundant, the Contribution Agreement still retains a "definite or certain legal meaning," *id.*, and there is no ambiguity with respect to the parties' intent, which was to exclude accounts receivable from the transaction.

[72] R. Doc. No. 386-19, at 1.

[73] R. Doc. No. 386-19, at 2. Additionally, the Court notes that plaintiffs and the Avondale Interests assert that Membership Interests and Asset Purchase Agreement was part of the same transaction as the Contribution Agreement and must be construed along with it. R. Doc. No. 457, at 6; R. Doc. No. 464, at 8. This interpretation violates article 3.4 of the Contribution Agreement, which provides that the Contribution Agreement "sets forth the entire agreement of the parties and supersedes all prior agreements, arrangements, and understandings relating to the subject matter hereof." R. Doc. No. 386-6, at 3.

liabilities "in connection with, or arising out of, the Contributed Assets" were transferred to Luling,[74] and there is no evidence that any of the transferred assets relate to Comardelle's claims or employment:[75] plaintiffs are not asserting any premises liability claims against P2S, and plaintiffs do not allege that Comardelle was exposed to asbestos at any SECO facility.[76] Any duties that SECO owed to its employees existed separately from its assets, and PSCIO did not transfer liability for the breach of those duties to Luling.

For the above reasons, the Court finds that the Contribution Agreement did not convey any assets (or their corresponding liabilities) that were not listed in Schedule 1.1. Despite the fact that the parties offer differing interpretations, the Court finds as a matter of law that there is only one reasonable interpretation of the contract. *See Tex. Indus., Inc.*, 486 F.3d at 846. Accordingly, P2S is not liable as SECO's corporate successor under Texas law because it did not expressly assume any liability to plaintiffs or the Avondale Interests. *See* Tex. Bus. Org. Code § 10.254.

### D. Louisiana Law

"Under Louisiana law, the interpretation of an unambiguous contract is an issue of law for the court." *Amoco Prod. Co. v. Tex. Meridian Res. Exp. Inc.*, 180 F.3d 664, 668 (5th Cir. 1999) (citing *Tex. E. Transmission Corp. v. Amerada Hess Corp.*, 145 F.3d 737, 741 (5th Cir. 1998)). "The interpretation of a contract is the determination of the common intent of the parties." La. Civ. Code art. 2045. "The words of a contract are to be construed using their plain, ordinary and generally prevailing meaning, unless the words have acquired a technical meaning." *Guidry v. Am. Pub. Life Ins. Co.*, 512 F.3d 177, 181 (5th Cir. 2007).

---

[74] R. Doc. No. 386-6, at 2.
[75] The Court notes that neither plaintiffs nor the Avondale Interests argue that P2S is liable based on any liabilities that correspond to any asset listed in Schedule 1.1.
[76] R. Doc. No. 563.

"When the words of the contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La. Civ. Code art. 2046. "A contract provision is not ambiguous where only one of two competing interpretations is reasonable or merely because one party can create a dispute in hindsight." *Amoco Prod.*, 180 F.3d at 668-69 (quoting *Tex. E. Transmission Corp.*, 145 F.3d at 741) (internal quotation marks omitted). "In the context of contract interpretation, only when there is a choice of reasonable interpretations of the contract is there a material fact issue concerning the parties' intent that would preclude summary judgment." *Id.* at 669. "Parol or extrinsic evidence is generally inadmissible to vary the terms of a written contract unless the written expression of the common intention of the parties is ambiguous." *Campbell v. Melton*, 817 So. 2d 69, 75 (La. 2002).

For the purpose of interpreting the Contribution Agreement, Louisiana law does not substantially differ from Texas law. As previously stated, there is no "choice of reasonable interpretations of the contract" because the Contribution Agreement is susceptible of only one reasonable interpretation. *Amoco Prod.*, 180 F.3d at 669.

The Avondale Interests also contend, "If the court concludes the language of the contracts does not equate to an express assumption of liability, at a minimum the Indemnification language is an implied assumption of liability."[77] The indemnity provision that the Avondale Interests cite is contained in the Membership Interests and Asset Purchase Agreement.[78] As discussed above, Luling was not a party to that agreement, and because the Court does not find the Contribution Agreement to be ambiguous, the Court will not consider such extraneous evidence. *Campbell*, 817 So. 2d at 75.

---

[77] R. Doc. No. 464, at 14.
[78] R. Doc. No. 386-19, at 27-32.

**CONCLUSION**

The Court need not make any choice-of-law determination because there is no conflict: the Court finds that P2S is not the successor to SECO's liabilities to plaintiffs and the Avondale Interests under either Texas or Louisiana law. Accordingly,

**IT IS ORDERED** that the motions for summary judgment are **GRANTED**. Plaintiffs' claims and the Avondale Interests' crossclaims for virile share contributions against defendant, P2S, LLC, are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that the alternative motion for partial summary judgment is **DISMISSED AS MOOT**.

New Orleans, Louisiana, December 15, 2014.

_____
**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**